### F. BUDDIE CONTRACTING, LTD., et al., Plaintiffs,

### v.

### CUYAHOGA COMMUNITY COLLEGE DISTRICT, et al., Defendants.

### No. 1:96CV2136.

United States District Court,
N.D. Ohio,
Eastern Division.

Oct. 21, 1998.

---

586

Timothy A. Marcovy, Malcolm S. Young, Willacy & Lopresti, Cleveland, OH, for plaintiffs.

Thomas L. Colaluca, Johnson & Angelo, Cleveland, OH, for defendants.

## MEMORANDUM OPINION AND ORDER

PERELMAN, United States Magistrate Judge.

The Defendants in this action are the President/Secretary of Cuyahoga Community College District (CCC), Dr. Jerry Sue Thorton; the CCC Executive Vice President of Finance and Business Services Treasurer, John Harper, the CCC Assistant Vice President of Operations, Robert Bennett; and CCC Board of Trustee members Hilton Smith, Caesar Burkes, David Byrnes, John Chiappetta, Nadine Feighan, William Hulett, Pearl Livingstone, Zoe Taylor and Timothy Wullger, all of whom have been sued in their official and individual capacities as a consequence of the Plaintiff's bid on a contract for construction work to be done for CCC being denied by reason of the Plaintiff's failure to satisfy a Minority Business Enterprise (MBE) requirement included in a minority set-aside program adopted for CCC.

■ Defendants have moved for pretrial summary judgment seeking a determination that they possess qualified immunity from suit in their individual capacities. The rationale of their position is that their actions in adopting and/or implementing the challenged set-aside program did not violate clearly established constitutional law.

■ Qualified immunity shields government officials performing discretionary functions "from liability or civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). One of the primary purposes behind the qualified immunity doctrine is to allow officials to make "intelligent ... decisions without the constant fear of litigation infecting the decision-making process." *Acierno v. Cloutier,* 40 F.3d 597, 615 (3rd Cir.1994).

■ The burden is on the plaintiff to show that the defendant is not entitled to qualified

immunity. *Rich v. Mayfield Hts.*, 955 F.2d 1092 (6th Cir.1992).

■ In order to defeat a qualified immunity defense a plaintiff must show that in light of pre-existing law the contours of the right allegedly violated were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

■ Once it has been found that a particular right has been violated a court must look to decisions of the United States Supreme Court, "then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits," to determine whether that right was clearly established at the time of the violation. *Buckner v. Kilgore,* 36 F.3d 536, 539 (6th Cir.1994). A broad constitutional right may be clearly established even though its parameters are not plainly defined. *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034. Therefore, it is possible for an officer to be aware of the existence of the right but be objectively reasonable in believing that his her conduct did not violate it.

Turning to the present case the MBE policy, first enacted in 1982 and amended in 1994, requires that a prime contractor on a public works contract with CCC award at least 10% of the total value of the contract to MBE subcontractors. The policy carries an additional provision for waiver of the participation requirement at the Board's discretion. The stated purpose of the MBE set-aside policy is:

> ... to actively seek and expand the use of minority owned businesses, thereby helping them become more stable, successful, competitive members of the business community. CCC recognizes the value of having minorities as a viable part of the economic system.

It is undisputed that prior to enacting the amended policy no race neutral alternatives were considered and no findings were made by the individual Defendants (or anyone else) that CCC had discriminated against any of the specified minority groups in the past. Additionally, the record establishes without dispute that the Board operated under an informal "no waiver" rule which essentially negated the waiver provision in the policy.

Plaintiff contends that it was clearly established at the time CCC turned down its bid on the contract that CCC's set-aside policy violated his constitutional right to equal protection.

In a separate opinion this Court has held that CCC's MBE policy was unconstitutional. This Court sees no need to restate that ruling in detail, and will only address the issue as it relates to whether that could be said to have been clearly established at the time the MBE policy was applied to the plaintiff.

■ Race conscious legislation is analyzed under a strict scrutiny standard by which "such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). *City of Richmond v. J.A. Croson Company,* 488 U.S. 469, 472, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Satisfaction of the compelling interest prong of the strict scrutiny test requires a "strong basis in evidence for [the] conclusion that remedial action [is] necessary." *Wygant v. Jackson Board of Education,* 476 U.S. 267, 278, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). While there may be a compelling interest in remedying past discrimination by the governmental entity seeking to adopt racial classifications, remediation of *society's* history of discrimination or mere desire to increase minority representation in a particular field without regard to the existence of past discrimination cannot qualify as the compelling interest necessary to support a race conscious plan. *Id.* at 274, 106 S.Ct. 1842. Furthermore, discrimination which is remote in time, or which has already been remediated cannot qualify as the "strong ba-

sis in evidence" necessary to demonstrate a compelling purpose. *Brunet v. City of Columbus*, 1 F.3d 390, 409 (6th Cir.1993), *cert. denied*, 510 U.S. 1164, 114 S.Ct. 1190, 127 L.Ed.2d 540 (1994).

As to the second prong of the strict scrutiny test considerations in the determination of whether an affirmative action plan is narrowly tailored are:

> the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.

*United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). For a race conscious remedial measure to be deemed narrowly tailored "the classification at issue must 'fit' with greater precision than any alternative means." *Wygant*, 476 U.S. at 279 n. 6, 106 S.Ct. 1842.

With these legal precepts predating 1992 and 1996, this Court concludes that it was clearly established at the time that the CCC plan was amended and when it was applied to Plaintiff that a governmental entity implementing an affirmative action plan must first determine that there is a strong basis in evidence for the need for such plan, and then consider other non-race based alternatives. If there are no reasonable alternatives the affirmative action remedy must be flexible, be of limited duration, and have numerical goals meaningfully related to the relevant market.

It is undisputed that Defendants considered none of these things. In deposition testimony several of the individual Defendants explicitly stated that they never considered whether CCC had been guilty of prior discrimination against any of the minority groups specified in the set-aside program. Indeed, the stated purpose of the set-aside policy does not mention past discrimination, but rather, appears to address societal discrimination with the goal of advancing the cause of minorities in general for the common good. While perhaps laudable, that goal was specifically rejected in *Wygant* as being

an inappropriate basis upon which to build an affirmative action plan.

Although the standard for application of the qualified immunity doctrine is objective rather than subjective, this Court notes that there is evidence that the Board members were actually aware of the two prongs of the strict scrutiny but took no steps to comply with them. Board meeting notes from meetings held July 18 and 20, 1995 state:

> ... Ms Billingsley [legal counsel for CCC] explained recent Supreme Court decisions that negate institutional ability to include such clauses and their additional impact on affirmative action and MBE policies in general. She noted that their interpretation of this matter was one of "strict scrutiny" and that now policies must be based upon hard evidence proving past discrimination, surveys supporting this and other documentation. Their recommendation was that the College should not increase its 25% goal noting that, otherwise, the institution was facing the risk of legal action from vendors not selected in bid processes. It was noted that the College's construction contract awards are in conformity with the state's recently changed law requiring 10% participation and that the higher figure was applied to other types of purchases.
>
> —Dr. Thornton explained that County's demographics of 25% minority was the basis for the policy.
>
> —Ms. Billingsley said that the court looks at the numbers of minorities who are particular types of vendors in defining the universe and that countywide surveys are not adequate to this task or now acceptable for this purpose.

Despite the actual awareness of the need for a finding of discrimination, and looking to statistics which were reflective of general demographics and did not measure the appropriate pool, the Board took no action to comply with the clearly established standard for race-conscious policies.

In asserting that they are nonetheless entitled to qualified immunity Defendants rely in part on the fact that the set-aside policy was enacted in accordance with state law mandating such policies, arguing that it was there-

fore reasonable to have believed that the policy was constitutional. Defendants further contend that a 1983 Sixth Circuit decision lends support to their reasonable belief that their actions were constitutional.

With respect to the Ohio statutory underpinnings of the policy, CCC's MBE program was amended in accordance with a 1993 state statute which provides in pertinent part:

> (A) In awarding contracts for a work of improvement pursuant to the official plan of a community college district, the board of trustees of the community college district shall comply with the percentage requirements of division (C)(1) of section 123.151 [123.15.1] of the Revised Code. Any contract so awarded shall require the contractor to comply with the requirements of division (C)(2)(a) of section 123.151 [123.15.1] of the Revised Code in awarding subcontracts and in purchasing services and materials under that contract. If, after making a good faith effort, a contractor is unable to comply with the requirements of division (C)(2)(a) of section 123.151 [123.15.1] of the Revised Code because he is unable to locate minority business enterprises available to accept subcontracts or from whom he may purchase materials or services, the contractor may apply to the board of trustees of the district for a waiver or modification of the requirements. If the board of trustees of the district determines that the contractor made a good faith effort to locate and use minority business enterprises but was unable to do so, it may waive the requirements of division (C)(2)(a) of section 123.151 [123.15.1] of the Revised Code, authorize a reduction in the total value of the contract required to be designated to minority business enterprises.

■ "Courts have ... held that the existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional." *Grossman v. City of Portland,* 33 F.3d 1200, 1209 (9th Cir.1994). While an authorizing statute is evidence of objective good faith it is not dispositive of the issue. "Where a statute authorizes official conduct which is patently violative of fundamental constitutional principles, an officer who enforces that statute is not entitled to qualified immunity." *Id.* This state law must be read with reference to controlling Supreme Court decisions if such decisions exist. *See, e.g., Gittens v. LeFevre,* 891 F.2d 38 (2d Cir.1989) (court first looked to Supreme Court precedent to determine that state statute did not fall within defined parameters of unconstitutionality before finding that officers were reasonable in their interpretation of the state law.) In the absence of relevant Supreme Court law an officer may look to the law in his/her circuit to assess the constitutionality of an authorizing state statute. *See, e.g., Moniz v. City of Fort Lauderdale,* 145 F.3d 1278 (11th Cir.1998) (officers in police department reasonably relied on a judicially endorsed consent decree and the upholding of a similar consent decree by the Eleventh Circuit in effective the department's affirmative action promotion plan.)

■ Thus, it is clear that the existence of an authorizing state law does not alter the qualified immunity analysis. A law which is clearly established by Supreme Court and/or Circuit court decisions does not become less clear by reason of conflicting state statutes. *Compare, Cope v. Heltsley,* 128 F.3d 452, 460 (6th Cir.1997) (in the absence of Supreme Court or Sixth Circuit precedent to direct an officer's conduct it is objectively reasonable for the officer to rely on presumptively constitutional state law.).

■ Application of these principles to the present case leads to the conclusion that Defendants are not protected by their adherence to state law. Qualified immunity is intended to allow officials to render intelligent decisions even though they may, upon further reflection, be deemed to have been erroneous. It is not intended to allow individual officers to abdicate their decision-making obligations in blind reliance on state statutes. This is especially true in this instance where the officers involved, unlike police officers who frequently have little rule-making authority, are endowed with independent policy-making authority and have an obligation to make reasoned decisions with respect to programs and policies which they promul-

gate, regardless of whether those programs and policies are promulgated in accordance with State law. This is particularly so where the state statute involves racial classifications and, therefore, enjoys no presumption of constitutionality.

Defendants' reliance on *Ohio Contractors Association v. Keip,* 713 F.2d 167 (6th Cir. 1983) for their assertion that their belief in the constitutionality of § 3354.161 was reasonable is misplaced. *Keip,* which upheld Ohio's 1980 MBE act, O.R.C. § 123.151(C)(2)(b), against a constitutional challenge, did not address the state statute at issue herein.[1] Moreover, Keip did not address or authorize set-aside programs by CCC, and the law is clear that a governmental entity may remedy only its own discrimination through race-conscious measures. Finally, *Keip* has at least tacitly been abrogated by later Supreme Court and Sixth Circuit cases which have set forth the standards for strict scrutiny review of affirmative action plans and acknowledged that *Keip* did not apply those standards. *Croson,* 488 U.S. at 475, 109 S.Ct. 706 [2]; *Michigan Road Builders Ass'n Inc. v. Milliken,* 834 F.2d 583 (6th Cir.1987).

In the opinion of this Court the present case is similar to *Alexander v. Estepp,* 95 F.3d 312 (4th Cir.1996), in which six white men and one white woman sued county and fire department officials alleging that the fire department's affirmative action policy violated their right to equal protection. Finding that the policy was not narrowly tailored because reasonable alternatives were not considered and members of certain minorities (South Asians and Hispanics) were benefitted irrespective of whether they had been the victims of discrimination in the past, the court addressed whether the individual officers were entitled to qualified immunity and found that they were not. The court, relying on *Croson,* reasoned that:

> an affirmative action program may not give benefits to minorities in general, but it

must target benefits only to particular groups that were the subject of particular acts of discrimination: "The random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination" in the particular field and in the particular location "suggests that perhaps the [defendant's] purpose was not in fact to remedy past discrimination." *J.A. Croson,* 488 U.S. at 506, 109 S.Ct. 706.... Furthermore, in *Podberesky v. Kirwan,* 956 F.2d 52 (4th Cir.1992), we reaffirmed the importance of maintaining a close nexus between the remedy and the discrimination the remedy is intended to correct. *Id.* at 318. Having found that the program was not narrowly tailored to redress actual discriminatory practices the court found that the officers implementing the program were not entitled to qualified immunity.

As in *Alexander,* in this case there is no nexus between the remedy employed by CCC and the extent, or even existence, of past discrimination or, the part of CCC against the minority groups to benefit from the plan. Moreover, the plan is not applied flexibly nor is in of limited duration, and less onerous alternative measures were never considered.

In conclusion, this Court finds that the law setting forth the necessary factors which must be addressed before an affirmative action plan is implemented was clearly established when CCC amended its MBE plan and when that plan was applied to Plaintiff and further finds that there is no evidence that the defendants considered any of those factors when implementing the plan. For that reason, Defendants are not entitled to qualified immunity,[3] and their motion for partial summary judgment is denied.

**IT IS SO ORDERED.**

---

1. O.R.C. § 3354.161 was not enacted until 1993.

2. Defendants' insistence that *Keip* has been given the Supreme Court's imprimatur is unpersuasive. In *Croson* the Court cited *Keip* favorably as an example of a case employing the proper statistical analysis. It did not otherwise cite *Keip* with

approval and, in fact, also cited it as having applied a less rigorous standard than that applied in *Wygant* and thereafter.

3. The complaint also challenges Defendants' FBE plan. This Court was unable to rule on the constitutionality of that program because Plain-

tiff failed to demonstrate standing to challenge it.
With respect to that policy, therefore, Defen-

dants' motion for qualified immunity is prema-
ture. *Siegert,* 500 U.S. at 232, 111 S.Ct. 1789.